UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>ANGEL RODRIGUEZ | No. 3:19-cr-58 (SRU) |

### ORDER

On October 15, 2019, Rodriguez pleaded guilty (pursuant to a plea agreement) before Magistrate Judge William I. Garfinkel to a lesser-included offense of count one and to count two of an indictment charging him with (1) possession with intent to distribute, and distribution of, fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Indictment, Doc. No. 21; Min. Entry, Doc. No. 34; Plea Agreement, Doc. No. 35. On January 7, 2020, I held a sentencing hearing and sentenced Rodriguez to 84 months' imprisonment (24 months on count one and the mandatory minimum 60 months on count two, to run consecutive) and three years' supervised release. *See* Min. Entry, Doc. No. 52; Judgment, Doc. No. 53 (entered on January 21, 2020). Rodriguez, who is 27 years old, is currently housed at the Federal Medical Center, Devens ("FMC Devens"), an administrative security federal medical center. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 7, 2021). Rodriguez's scheduled release date is June 21, 2026. *See id.* He has been incarcerated since his self-surrender on July 15, 2020. Rodriguez has thus served less than 9 months in prison, which is approximately 12.5 percent of his sentence (accounting for good-time credit).

On January 26, 2021, Rodriguez filed a *pro se* motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act. *See Pro Se* Mot. for

Sentence Reduction, Doc. No. 67 ("*Pro Se* Mot."). On March 9, appointed counsel filed a second motion for a sentence reduction and a supplemental memorandum in support. *See* Supp. Mot. for Sentence Reduction, Doc. No. 69; Supp. Mem. in Support of Sentence Reduction, Doc. No. 70 ("Rodriguez's Mem. of Law").

Rodriguez contends that "extraordinary and compelling reasons" warrant reducing his sentence to either time served or to some other period of incarceration shorter that the sentence I imposed. In particular, Rodriguez seeks relief based on his claimed medical conditions— including obesity, non-alcoholic fatty liver disease, absence of a spleen, asthma as a result of a formerly collapsed lung, and high cholesterol—that make him more vulnerable to COVID-19, should he contract the disease. *See Pro Se* Mot., Doc. No. 67, at 1–4; Rodriguez's Mem. of Law, Doc. No. 70, at 7–13. Rodriguez also claims that the sentencing factors in 18 U.S.C. § 3553(a) favor release, or at least a reduction in sentence. *See Pro Se* Mot., Doc. No. 67, at 15–18; Rodriguez's Mem. of Law, Doc. No. 70, at 17–21. Rodriguez filed relevant medical records. *See* Mot. to Seal, Doc. No. 71; Rodriguez's Medical Records, Doc. No. 72. On March 23, 2021, the government filed an opposition. *See* Gov't Opp'n, Doc. No. 73. The government concedes that Rodriguez's obesity constitutes an extraordinary and compelling reason warranting a reduction in sentence but still asks me to deny Rodriguez's motion because Rodriguez's obesity "appears to be well-controlled at FMC Devens, Rodriguez has not shown that FMC Devens cannot manage the COVID-19 pandemic, and the § 3553(a) factors do not warrant a sentence reduction." *Id.* at 5. On March 30, Rodriguez filed a reply. *See* Rodriguez's Reply, Doc. No. 74.

For the following reasons, I **deny** Rodriguez's motion for relief and decline to alter his sentence.

### I. Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons. It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release. *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment.—The court may not modify
> a term of imprisonment once it has been imposed except that – (1) in any case –

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>
> > (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020).

However, in September 2020, the Second Circuit clarified that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves. *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). Since the Second Circuit decided *Brooker*, several courts of appeals in other circuits have concurred that section 1B1.13 is not applicable to compassionate release motions brought by defendants. *See United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1101 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. McGee*, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021). Because in this case Rodriguez himself made a motion for compassionate release, I may "consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion. *Brooker*, 976 F.3d at 237.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020). Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)). Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions. *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . may reduce the term of imprisonment . . . ."). A court may not reduce a term of imprisonment without "considering the factors set forth in section 3553(a) to the extent that they are applicable." *Id.*; *see also United States v. Torres*, 464 F. Supp. 3d 651, 658 (S.D.N.Y. 2020) (explaining that courts must consider section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).

**II.   Discussion**

   A.   Background

Rodriguez was arrested on February 4, 2019. *See* PSR, Doc. No. 41, at ¶ 4. The FBI had targeted Rodriguez based on his "purported involvement in the unlawful distribution of fentanyl." *Id.* at ¶ 8. On February 4, FBI agents surveilled Rodriguez and, using a confidential informant, arranged for an undercover officer to purchase 200 grams of fentanyl from Rodriguez. *See id.* at ¶¶ 8–11. (The "purchase" was never consummated—that quantity of fentanyl apparently would have cost $13,000. *See* Gov't Opp'n, Doc. No. 73, at 1.) Around noon, Rodriguez entered the passenger side door of the undercover officer's car. *See* PSR, Doc. No. 41, at ¶ 11. "A short time later," the undercover officer "exited his/her vehicle and gave investigators a predetermined signal that Mr. Rodriguez was in possession of the requested 200 grams of fentanyl." *Id.* As FBI agents went to arrest Rodriguez, they "observed a black handgun

5

in [the] back pocket of Mr. Rodriguez's pants." *Id.* at ¶ 12.  "As he was taken out of the vehicle the handgun in his back pocket fell out onto the passenger seat of the vehicle." *Id.*  The handgun—a black Ruger—was "loaded with six Luger 9mm rounds inside the magazine." *Id.*  Field and laboratory testing confirmed that Rodriguez had possessed 199.8 grams of a white, powdery substance that tested positive for fentanyl.  *See id.* at ¶¶ 13, 15.

Rodriguez grew up in difficult circumstances.  Although Rodriguez reported being "very happy" until he was 10, his parents separated around that time due to his father's crack cocaine addiction, and that changed everything.  *See id.* at ¶ 40.  Even though this case is his first conviction of any kind, Rodriguez reports that after his parents separated, "his grades slipped, he skipped school, and was getting into trouble." *Id.*  Indeed, Rodriguez has a substance abuse history involving alcohol, marijuana, Percocet, PCP, Xanax, and ecstasy dating back to age 13.  *See id.* at ¶¶ 54–56.  Rodriguez's neighborhood in Hartford was dangerous.  In fact, Rodriguez was accidentally shot in 2016, and, as a result, doctors had to remove his spleen.  *See id.* at ¶¶ 42, 48, 50.  Rodriguez became a father at the age of 17; he has two young children with his now-fiancée.  *See id.* at ¶¶ 45–47.

After his arrest in this case in February 2019, Rodriguez was released on an unsecured bond of $100,000.  *See* Appearance Bond, Doc. No. 12.  Rodriguez made positive strides on pre-trial release.  For instance, Rodriguez got clean and did not render any positive drug tests past May 8, 2019.  *See* PSR, Doc. No. 41, at ¶ 56.  In addition, Rodriguez obtained full-time work at Laz Parking and earned $11 per hour.  *See id.* at ¶ 61.  Rodriguez also enrolled in adult education classes.  *See id.* at ¶ 60.

At sentencing, Rodriguez faced a mandatory minimum sentence of five years (on count two), and a Guidelines range of 106-to-117 months' imprisonment.  *See id.* at ¶¶ 68–69.  I

sentenced Rodriguez to a below-Guidelines sentence of seven years' imprisonment. Several comments I made at Rodriguez's sentencing are relevant to the resolution of the instant motion.

I noted that Rodriguez was lucky to be facing the mandatory minimum and Guidelines range that he was. Regarding the mandatory minimum, Rodriguez greatly benefitted from the government's charging decisions. Based on the quantity of fentanyl involved (200 grams), Rodriguez could have been—and in fact had been[1]—facing a mandatory minimum sentence of five years on count one, in addition to a consecutive mandatory minimum sentence of five years on count two, leaving me with no choice but to sentence him to at least ten years' imprisonment. *See* Hr'g Tr., Doc. No. 61, at 13:13–16 ("He could have faced a mandatory five on the drug charge because of the quantity at issue. So the AUSA exercised discretion not to charge a mandatory ten, in effect."). Of course, Rodriguez's ultimate seven-year sentence was well below ten years. Regarding the Guidelines range, I remarked that Rodriguez would benefit from the fact that this was his first conviction, even though I was quite certain that this "wasn't [Rodriguez's] first drug deal" because "[y]ou don't start out dealing 200 grams of fentanyl." *Id.* at 17:25–18:9.

I remarked that Rodriguez's sentencing was a "sad day" because, while out on pre-trial release, Rodriguez had "shown the ability to work hard, to get a job, to keep a job, to impress people at work, [and] to stay drug free." *Id.* at 17:10–13. However, I emphasized that this was "a very serious crime, not only because of the presence of the gun but because of the quantity of fentanyl." *Id.* at 17:14–16. Although the fentanyl that Rodriguez dealt had not been tied to an overdose death, I noted that "fentanyl is tied to drug overdoses all the time, and it's a dangerous,

---

[1] The indictment charged Rodriguez in count one with a violation of 21 U.S.C. § 841(b)(1)(B)(vi), which carries a five-year mandatory minimum penalty. *See* Indictment, Doc. No. 21. But in the plea agreement, Rodriguez agreed to plead guilty to a violation of 21 U.S.C. § 841(b)(1)(C), a lesser-included offense of count one that does not include any mandatory minimum penalty. *See* Plea Agreement, Doc. No. 36, at 1.

7

dangerous drug to be dealing." *Id.* at 17:21–23.  I also made clear that "I think you [] need to be punished," "[y]ou need to be deterred, frankly," and "[o]thers need to be deterred from this kind of conduct."  *Id.* at 18:17–19.  For those reasons, I remarked that "the sentence here has to be a meaningful one."  *Id.* at 18:20.

I ordered that Rodriguez self-surrender on March 25, 2020.  *See id.* at 23:23–25.  However, on March 23, Rodriguez filed a motion for an extension of time, in which he explained that the BOP requested (due to the onset of the COVID-19 pandemic) that Rodriguez delay his self-surrender by 30 days.  *See* Mot. for Extension, Doc. No. 59.  I granted Rodriguez's motion.  *See* Order, Doc. No. 60.  In April, Rodriguez himself requested to extend his self-surrender by two months (until June 2020) based on fears regarding the pandemic.  *See* Mot. for Extension, Doc. No. 62.  I granted that motion, too.  *See* Order, Doc. No. 63.  In June, Rodriguez made a third motion requesting an extension of his self-surrender date for another month based on the threat of COVID-19.  *See* Mot. for Extension, Doc. No. 64.  The government opposed that motion.  *See id.*  Still, I granted Rodriguez's motion in part and ordered Rodriguez to self-surrender on July 15, 2020.  *See* Order, Doc. No. 65.

B. <u>The Parties' Arguments</u>[2]

Rodriguez argues that extraordinary and compelling reasons warrant his release, or at least a reduction in his sentence.  First, Rodriguez focuses on medical conditions that, in his view, put him at risk of severe illness from COVID-19, should he contract the virus.  According to Rodriguez, those medical conditions are:  (1) obesity, (2) a fatty liver, (3) asthma as a result of a formerly collapsed lung, (4) high cholesterol, and (5) having no spleen.  *See* Rodriguez's Mem. of Law, Doc. No. 70, at 7–11; *see also* Letter of Dr. Karen Jubanyik, Doc. No. 70-1 ("Jubanyik

---

[2] The parties agree that Rodriguez has satisfied section 3582(c)(1)(A)'s exhaustion requirement.  *See* Rodriguez's Mem. of Law, Doc. No. 70, at 4; Gov't Opp'n, Doc. No. 73, at 6.

Letter"). Although COVID-19 vaccines are now being offered to BOP inmates, Rodriguez had not received one at the time of his lawyer's filing of a memorandum in support of his motion for a reduction in sentence on March 9; in any event, because he has no spleen, Rodriguez argues that there is "simply no way to know if he will be able to gain a fully protective immune response" from the vaccine. Rodriguez's Mem. of Law, Doc. No. 70, at 11. Further, because many BOP staff and inmates have not yet been vaccinated (and may never be, if they choose to forgo the opportunity), Rodriguez argues that he suffers from an "unacceptable level[] of risk" by remaining in prison. *Id.* at 12 (quoting Jubanyik Letter, Doc. No. 70-1).[3]

Second, Rodriguez focuses on the conditions of his confinement at FMC Devens. Rodriguez points out that FMC Devens has suffered major COVID-19 outbreaks, including in January 2021, when FMC Devens had over 250 positive cases at one time. *See id.* at 13. FMC Devens has had 10 inmate deaths, which is more than all but three other facilities. *See id.* at 14. Even though FMC Devens no longer faces a COVID-19 crisis, Rodriguez asserts that such a crisis may recur, particularly due to "the increase in new variants." *See id.* at 14–15. In any event, Rodriguez points out that certain courts have granted inmates' motions for release even where those inmates' facilities had no active COVID-19 cases. *See id.* (citing cases). Rodriguez argues that the harsh conditions of his confinement at FMC Devens justify a reduction in

---

[3]     Cursorily, Rodriguez also notes that because he is "a Latino male," he is "at a much higher risk" of severe illness or death were he to contract COVID-19 because "COVID-19 has had a starkly disparate impact on the Hispanic/Latino populations throughout American society, for a variety of reasons." Rodriguez's Mem. of Law, Doc. No. 70, at 13 (cleaned up). As I have remarked elsewhere, Rodriguez is, sadly, correct in noting that both the rates of death and hospitalization from COVID-19 among Hispanic Americans is much higher than that among the general population. *See Risk for COVID-19 Infection, Hospitalization and Death by Race/Ethnicity*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Mar. 12, 2021). However, "so far as is currently understood, that difference most probably owes to long-standing systemic health and social inequities." *United States v. Leigh-James*, 2020 WL 4003566, at *8 (D. Conn. July 15, 2020) (cleaned up). Thus, the fact of Rodriguez's ethnicity itself "does not constitute a risk factor for COVID-19[] in the same way[] as, for instance, an underlying medical condition." *Id.* (cleaned up).

sentence because "a pandemic prison day is simply worth far more than a regular prison day." *Id.* at 22.

Rodriguez also argues that a reduction in sentence (either to time served with a lengthy period of home incarceration or to anything less than seven years) would result in a sentence sufficient to accomplish the goals of sentencing as articulated in 18 U.S.C. § 3553(a). Although Rodriguez acknowledges that the relief he seeks is "significant," Rodriguez points out that when I sentenced him, I "did not have a reason to consider Mr. Rodriguez's medical issues in relation to a period of incarceration during a global pandemic." *Id.* at 17. Although Rodriguez acknowledges that "the circumstances of this offense are serious, and warranted serious punishment by the Court," he argues that other section 3553(a) factors weigh in favor of a reduction in sentence. *Id.* at 19. For instance, Rodriguez points to his job at Laz Parking and enrollment in adult education classes while on pre-trial supervision. *See id.*

Rodriguez asserts that his experience thus far at FMC Devens evinces his continued rehabilitation: He has received no disciplinary tickets and holds two jobs, one in the auto garage (since August 2020), and another as a dog handler (since December 2020). *See id.* at 20; *see also* BOP Record, Doc. No. 70-2. Further, Rodriguez has "attempted to avail himself of educational classes," but many—including GED classes—have been "put on hold because of the pandemic." Rodriguez's Mem. of Law, Doc. No. 70, at 20. Regarding his threat of recidivism, Rodriguez claims that there is "a strong likelihood" that he "will not commit further crimes" upon his release because "these last eight months away from his family and children have been incredibly difficult for him." *Id.* at 20–21. In addition, because Rodriguez proposes release to home incarceration, he would be under especially stringent conditions. *See id.*

The government takes a different view. Although the government concedes that "Rodriguez's obesity amounts to an extraordinary and compelling reason," the government argues that it "appears to be well-controlled at FMC Devens" and that "Rodriguez has not shown that FMC Devens cannot manage the COVID-19 pandemic." Gov't Opp'n, Doc. No. 73, at 5. The government also disputes whether Rodriguez's other asserted medical conditions—fatty liver, potential asthma, high cholesterol, apparent prediabetes, a previously collapsed lung, and asplenic status—rise to the level of an extraordinary and compelling reason warranting a reduction in sentence. *See id.* at 7–11. Regarding COVID-19 vaccinations, the government notes that, at the time of its filing (March 23, 2021), FMC Devens had "administered vaccinations to 336 staff and to 243 inmates." *Id.* at 12. The government reports that Rodriguez will soon be vaccinated. *See id.* at 12–13.[4] Finally, the government notes that, although FMC Devens has had high infection and death numbers, Rodriguez "was protected enough that he did not contract COVID-19 . . . and [] FMC Devens, as a federal medical center, necessarily houses some of the most medically vulnerable inmates." *Id.* at 13. The government also argues that the section 3553(a) sentencing factors weigh against any sentence reduction, even a partial one. *See id.* at 15–23. The government posits that Rodriguez's incarceration has not been unduly punitive, as evidenced by the BOP programming and employment opportunities that Rodriguez has taken advantage of. *See id.* at 21.

In reply, Rodriguez contests that his obesity (or anything else) has been well-managed at FCI Devens. *See* Rodriguez's Reply, Doc. No. 74, at 2, 6–7. Regarding his imminent COVID-19 vaccination, Rodriguez argues that the government "places too much faith in the vaccine

---

[4] More specifically, the government explains that Rodriguez has not yet been vaccinated because of complications arising from other vaccinations that Rodriguez regularly receives due to his not having a spleen. The government indicates that Rodriguez will be vaccinated as soon as he "clear[s] the waiting times for his recent regular vaccinations." Gov't Opp'n, Doc. No. 73, at 12–13.

11

rollout" because herd immunity—both at FMC Devens and in the general population—is still far off. *See id.* at 4–6. Finally, Rodriguez reiterates his "commitment to rehabilitation." *Id.* at 7. Rodriguez's reply does not address the section 3553(a) sentencing factors.

   C.  Evaluation

I will not reduce Rodriguez's sentence because doing so would not comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

Although I need not (and do not) decide whether Rodriguez has established extraordinary and compelling reasons warranting relief based on some combination of his medical conditions, I note a salient weaknesses in Rodriguez's arguments. It is significant that Rodriguez has so far served less than 15 percent of the sentence I imposed. In evaluating motions for reduction in sentence, courts routinely consider the fraction of a sentence that the defendant has already served in determining whether extraordinary and compelling reasons exist. *See, e.g.*, *United States v. Wooten*, 2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020). In general, the shorter the amount of time remaining on a defendant's sentence, the more likely a court may be to find that the defendant has established extraordinary and compelling reasons warranting a reduction in sentence. *See United States v. Perez*, 451 F. Supp. 3d 288, 294 (S.D.N.Y. 2020) (explaining that, given the threat of COVID-19, when a defendant has a small fraction of his sentence remaining, "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"). In contrast, Rodriguez cites no case in which a court has released (or reduced the sentence of) a defendant who has served so little of his sentence. In fact, courts routinely reject motions for reductions in sentence made by inmates who have served less than 20 percent of their sentences based, in part, on that fact. *See,*

12

*e.g.*, *United States v. Suarez*, 2020 WL 7646888, at *5 (S.D.N.Y. Dec. 23, 2020); *United States v. Alvarez*, 2020 WL 3047372, at *5 (D. Or. June 8, 2020).

In any event, I need not resolve whether extraordinary and compelling reasons warrant a reduction in Rodriguez's sentence because I hold that reducing Rodriguez's sentence would result in a sentence insufficient to achieve the purposes of sentencing. Pursuant to section 3553(a), I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). I must also examine other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* § 3553(a)(1).

On balance, the section 3553(a) factors strongly indicate that Rodriguez's current sentence is the shortest sentence sufficient to serve the purposes of sentencing. Most importantly, this offense was extremely serious, and that seriousness has not changed since I sentenced Rodriguez a short time ago, in January 2020. *See* Hr'g Tr., Doc. No. 61, at 17:14–16 (remarking that this crime was "very serious" because of the quantity of fentanyl and the presence of a gun). In fact, the drug overdose crisis in this state has become even more dire. According to the State of Connecticut's Office of the Chief Medical Examiner, 1374 individuals died in 2020 from accidental drug overdoses, and 1159 of those deaths involved fentanyl. *See Statistics*, OFFICE OF THE CHIEF MED. EXAMINER, https://portal.ct.gov/OCME/Statistics (last visited Apr. 7, 2021) (navigate to the .pdf document entitled "Calendar Years 2012 to 2020 Accidental Drug Intoxication"). Although there is no reason to conclude that Rodriguez is in any

way linked to those deaths, it is important that Rodriguez helped grow the market for fentanyl in Connecticut. That market is now booming. Reducing Rodriguez's sentence would not adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

Relatedly, the sentence I imposed in this case represented a lenient sentence in several ways. As described above, the Guidelines range for this offense was 106-to-117 months' imprisonment. I imposed a substantially below-Guidelines sentence of 84 months. In addition, Rodriguez was lucky that his Guidelines range was as low as it was because, as I remarked, this was clearly not Rodriguez's first significant drug deal.[5] *See* Hr'g Tr., Doc. No. 61, at 17:25–18:9. In addition, Rodriguez benefitted from the government's charging discretion by pleading guilty to a violation of 21 U.S.C. § 841(b)(1)(C) (no mandatory minimum) rather than 21 U.S.C. § 841(b)(1)(B)(vi) (five-year mandatory minimum). For those reasons, the seven-year sentence I imposed on Rodriguez was, by all accounts, lenient considering the seriousness of this offense.

At Rodriguez's sentencing hearing, I also specifically mentioned that a "meaningful" sentence was necessary to deter both Rodriguez himself and others who would distribute large quantities of fentanyl. *See* Hr'g Tr., Doc. No. 61, at 18:20. Reducing Rodriguez's sentence would not help achieve those goals. The goal of general deterrence is particularly important in this case because, as I have already mentioned, overdose deaths in Connecticut involving fentanyl are on the rise. Relatedly, granting Rodriguez's motion for a sentence reduction would not promote respect for the law. I allowed Rodriguez to delay his date of self-surrender by several months—including once over the government's objection—in an effort to help him avoid

---

[5] The government repeatedly claims that Rodriguez had a "self-imposed minimum distribution quantity of 50 grams" of fentanyl. *See* Gov't Opp'n, Doc. No. 73, at 1, 16; *see also* Gov't Sentencing Mem., Doc. No. 44, at 1. The government does not include a citation to that fact, so I am unable to independently verify it. Regardless, as I recognized at Rodriguez's sentencing hearing, the point remains: This was not Rodriguez's first drug deal.

serving time during the COVID-19 pandemic. I do not doubt that every day spent in prison during this pandemic has been difficult. But, in my view, it is significant that I have already, in a way, reduced the amount of time that Rodriguez must serve during the pandemic by allowing him to delay the start of his carceral sentence. In fact, when I granted Rodriguez's motions, I thought Rodriguez might completely avoid serving time during the pandemic, which I (like many others) hoped would be over in a matter of weeks or months.

### III.     Conclusion

For the foregoing reasons, Rodriguez's motion for release or a reduction in sentence, doc. no. 69, is **denied**. Rodriguez's duplicative *pro se* motion, doc. no. 67, is **denied as moot**. And Rodriguez's motion to seal his medical records, doc. no. 71, is **granted**.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 7th day of April 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge